Geoffrey S. Kercsmar (#020528)
Sean J. O'Hara (#024729)
Eric B. Hull (#023934)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gsk@kflawaz.com
sjo@kflawaz.com
ebh@kflawaz.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Oasis Foot & Ankle, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>Scottsdale Healthcare Hospitals, an Arizona nonprofit corporation d/b/a HonorHealth, Sonoran Orthopaedic Trauma Surgeons, P.L.L.C, an Arizona professional limited liability company, Foothills Orthopaedic Specialists, P.C., an Arizona domestic for-profit corporation, and Mallin & Seidel Orthopaedic Oncology, an Arizona professional limited liability company L.L.C. d/b/a Specialty Orthopaedic Surgery,<br><br>Defendants. | Case No. _____<br><br><br>**COMPLAINT** |

## Summary of Case

1.      Plaintiff Oasis Foot & Ankle, LLC ("Oasis") is a group of doctors of podiatric medicine with locations in Phoenix, Deer Valley and Tempe. Three of Oasis's doctors—Drs. Brewer, De La Cruz and Rand—have over 65 years of

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1

combined experience. Together, they have performed thousands of orthopedic procedures on the bones, ligaments and tendons of the foot and ankle. Oasis's doctors are widely recognized as experts in their field, including limb-saving techniques developed over years of training and practice.

2.     Even though Oasis has a written, enforceable agreement with Defendant Scottsdale Healthcare Hospitals d/b/a HonorHealth ("HonorHealth") to provide on-call services and consultations to HonorHealth's John C. Lincoln Medical Center and Deer Valley Medical Center (*see* Exhibit 1), HonorHealth has systematically excluded Oasis in several ways described herein.

3.     HonorHealth's refusals have nothing to do with quality of Oasis's medical care. Instead, HonorHealth has discriminated against doctors of podiatric medicine in favor of medical doctors from other branches of medicine, in particular, orthopedic surgeons.

4.     Worse, HonorHealth has ceded its decision-making regarding doctors of podiatric medicine to orthopedic doctors who are primarily motivated by anticompetitive animus.

5.     Because foot- and ankle-trauma surgeries are some of the most lucrative procedures involving the foot and ankle, these orthopedic doctors have caused HonorHealth to participate in what amounts to a group boycott of podiatrists for surgeries on lower-limb bones, ligaments and tendons, together with emergency room consults on the same.

6.     Defendants Sonoran Orthopaedic Trauma Surgeons, P.L.L.C. ("SOTS"), Foothills Orthopaedic Specialists, P.C. ("Foothills") and Specialty Orthopaedic Surgery ("Specialty Orthopaedic") (collectively, the "Orthopedist Defendants") consider Oasis to be a competitor for care, consultations and surgical procedures on the bones, ligaments and tendons of the foot and ankle.

7.     Not coincidentally, the Orthopedist Defendants—together with other prominent, private-practice orthopedic surgeons and practices—serve as members of

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1   the various orthopedic and surgery committees of HonorHealth. The Orthopedist
2   Defendants have used these positions of power to conspire with HonorHealth to
3   eliminate competition and preserve lucrative consultations and surgeries on the
4   bones, ligaments and tendons of the foot and ankle for orthopedic doctors, and in
5   particular, those orthopedists affiliated with the Orthopedist Defendants.

6       8.    The result has been an anticompetitive group boycott of podiatrists that
7   has negatively impacted the market for foot and ankle surgeries and consultations in
8   north Phoenix and Scottsdale. Even worse, this collusive conduct has had a
9   demonstrable negative impact on patient care at HonorHealth.

**Jurisdiction and Venue**

11       9.    Pursuant to 28 U.S.C. § 1331, the Court has subject-matter jurisdiction
12   over plaintiff's claims under 15 U.S.C. §§ 1 (The Sherman Act). The Court also has
13   jurisdiction under 28 U.S.C. § 1337 for regulation and protection of commerce. This
14   Court has jurisdiction under 28 U.S.C. § 1367 over the pendant state law claims.

15       10.    This Court has personal jurisdiction over defendants, all of whom
16   reside in Arizona, and are thereby subject to the jurisdiction of a court of general
17   jurisdiction in the State of Arizona.

18       11.    Venue in the District of Arizona is proper under 28 U.S.C. § 1391(b)
19   because all of the defendants are residents of the State of Arizona, and because the
20   defendants' actions occurred in Arizona and in this judicial district.

**Parties**

22       12.    Plaintiff Oasis is an Arizona limited liability company.

23       13.    Defendant Scottsdale Healthcare Hospitals is an Arizona nonprofit
24   corporation doing business under the tradename HONORHEALTH .

25       14.    Defendant SOTS is an Arizona professional limited liability company.

26       15.    Defendant Foothills is an Arizona domestic for-profit corporation.

27       16.    Defendant Specialty Orthopaedics is an Arizona professional limited
28   liability company registered as Mallin & Seidel Orthopaedic Oncology.

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

3

**Trade and Commerce**

17.     Defendants' general business activities have at all times relevant to this complaint had a substantial effect on interstate trade and commerce.

18.     In connection with the sale, marketing and billing of medical services, defendants have used and continue to use instrumentalities of interstate commerce, including but not limited to the United States Postal Service and the Internet.

19.     Defendants sell, market and bill medical services to, among others, Medicare and Medicaid, which receive and use federal monies and numerous insurance carriers.

20.     Defendants purchase equipment and supplies from pharmaceutical and medical device companies that sell and market their products in interstate commerce.

21.     The specialty of podiatric surgery is a highly specialized medical practice.

22.     For instance, only ten hospitals serving Maricopa County offer Level I Trauma care including podiatric surgery.

23.     The conspiracy among defendants to deny Oasis's podiatrists surgical privileges at Honor Health's facilities, to deny Oasis podiatric consultations at Honor Health's Emergency Departments and to deny Oasis on-call opportunities at Honor Health's Emergency Departments, have the ultimate effect of denying Oasis the ability to practice surgery on the bones, ligaments and tendons of foot and ankle of patients in north Phoenix and Scottsdale, including limb-saving techniques developed over years of training and practice.

24.     Specifically, the doctors of the Orthopedist Defendants have used their offices and voting privileges at HonorHealth to create barriers to entry for doctors of podiatric medicine to practice at HonorHealth—and to deny doctors of podiatric medicine those same offices and voting privileges in order to ensure that their anticompetitive scheme will persist.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

4

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

25.     For its part, Defendant HonorHealth refuses to address this obvious conflict of interest, allowing the Orthopedist Defendants to rig the system to their own competitive advantage without regard for the effect on patient care or the legality of the conduct.

26.     Defendants' actions in denying Oasis's podiatrists surgical privileges at Honor Health's facilities, podiatric consultations at Honor Health's Emergency Departments and on-call surgical opportunities at Honor Health's Emergency Departments have affected interstate commerce to the detriment of patients by (i) reducing patient and physician choice; (ii) on information and belief, increasing wait times; (iii) on information and belief, increasing the length of post-operative hospital stays; (iv) on information and belief, increasing medical costs; (v) affecting payments to and from those who pay for their services (including out-of-state insurers and federally-funded insurance programs); and (vi) affecting payments to other interstate entities including pharmaceutical and medical device companies.

**No Immunity Under 42 U.S.C. § 11101 et seq.**

27.     The Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11111 et seq., provides limited civil immunity for certain persons with respect to "professional review actions" that meet certain criteria. None of defendants are eligible for HCQIA's limited civil immunity for the reasons stated below.

28.     As to all defendants, the illegal activities described in this complaint undermine the credentialing process itself and cannot be considered "professional review actions" under HCQIA. Therefore, defendants are not entitled to the limited civil immunity under HCQIA section 11151 with respect to such illegal activities.

29.     Defendants are not entitled to the limited civil immunity of HCQIA because any action or recommendation made by defendants constitute a denial of procedurally objective and fair consideration of any application for privileges and does not satisfy the requirements of the safe harbor.

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

30.     Accordingly, defendants cannot avail themselves of the protection of the limited civil immunity under HCQIA Section 11111(a)(1).

### Podiatry

31.     Podiatric medicine is a branch of medicine devoted to the treatment of disorders of the foot, ankle and lower extremities.

32.     Because doctors of podiatric medicine focus exclusively on the foot, ankle and lower extremities, their expertise in those areas is unrivaled in any other branch of medicine.

33.     Oasis employs doctors who have performed thousands of surgeries and treated countless patients. They are uniquely adept at repairing orthopedic injuries and in limb-saving techniques for both traumatic and diabetic patients.

34.     Further, Oasis's team of providers includes skilled orthopedic, vascular and plastic surgeons who are available round-the-clock and often provide their services on a pro bono basis in traumatic situations.

35.     All of Oasis's doctors of podiatric medicine are members of the American College of Foot and Ankle Surgeons (ACFAS) and/or board certified by the American Board of Podiatric Medicine.

36.     ACFAS "is a professional society of more than 7,600 foot and ankle surgeons." < https://www.acfas.org/About-Us/About-Us/>

37.     According to ACFAS, "The Council on Podiatric Medical Education (CPME) sets rigorous criteria for residencies in podiatric medicine and surgery. ACFAS members have had extensive training in foot, ankle and related lower extremity surgery and are examined and board certified (or board qualified) in foot and ankle surgery by the American Board of Podiatric Surgery (ABPS)." *See* ACFAS Position Statement on Credentialing of Podiatric Foot and Ankle Surgeons and Guidelines for Surgical Delineation of Privileges, dated July 16, 2011, attached as Exhibit 2.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

38.     Doctors of podiatric medicine complete four years of Podiatric Medical School, a length that is identical to both allopathic (MD) and osteopathic (DO) physicians.

39.     Like the other branches of medicine, Podiatric Medical School curriculum covers all of the basic and clinical sciences.

40.     In addition, like the other branches of medicine, doctors of podiatric medicine complete post-graduate residencies.

41.     Specifically, doctors of podiatric medicine complete post-graduate Podiatric Medicine and Surgery (PMSR) Residency.

42.     According to the ACFAS, "Similar to, and often integrated with residencies for MDs and DOs, Podiatric Surgical Residency programs provide training in general medicine, general surgery and surgical specialties. The critical difference, though, is in the volume of cases and time spent in foot and ankle specific training. Podiatric Surgical Residency Programs, which are a minimum of three years, provide significantly more foot and ankle training than any other specialty. A foot and ankle surgeon (DPM) will have demonstrated a cognitive knowledge of podiatric surgery, including the diagnosis and treatment of general medical problems and surgical management of foot and ankle diseases, deformities, and/or trauma, and those structures that affect the foot, ankle, and leg." *See* ACFAS Position Statement on Education, Training and Certification of Foot and Ankle Surgeons (DPMs), dated November 11, 2011, attached as Exhibit 3.

43.     In addition, "Multiple general orthopaedic resident surveys have shown that graduating general orthopaedic surgeons feel their program was deficient in foot and ankle surgery and that they are least prepared to treat the foot and ankle upon entering into private practice." *Id.* (citing Dailey, et al., August 1998; American Journal of Orthopedics 563-570).

44.     In fact, "[o]ne hundred percent of the board certification examination in Podiatric Surgery is relevant to the foot, ankle and lower leg. Less than five

percent of the American Board of Orthopaedic Surgery (ABOS) certification examination is specific to the foot and ankle." *Id*. Additionally, "[t]here is no Foot and Ankle specific certification process for orthopaedic surgeons." *Id*.

45.    As for continuing education beyond medical school, "[o]nly Podiatric Foot and Ankle Surgeons are required to attend foot and ankle specific courses, whereas orthopaedists may complete their Continuing Medical Education requirement entirely in areas outside the foot and ankle." *Id*.

46.    Accordingly, though the length and breadth of education and training are similar across these various branches of medicine, a difference lies in the level of specialization in training that doctors of podiatric medicine receive related exclusively to the foot, ankle and lower extremities.

47.    The training that doctors of podiatric medicine receive in the treatment of foot, ankle and lower extremities treatment is vast when compared to other branches of medicine. As opposed to doctors of podiatric medicine, "Allopathic (MD) and osteopathic (DO) physicians are not certified in specialty foot and ankle surgery, nor do they presently function under the quality assurance tool of a certificate of added qualifications for the same within their respective specialties." *Id*.

### Trauma Care

48.    This Complaint addresses HonorHealth's discrimination of doctors of podiatric medicine in general and specifically addresses defendants' anticompetitive conspiracy in restraint of trade involving the care, consultation and surgery on the bones, ligaments and tendons of the foot and ankle. Accordingly, a brief description of that market is warranted.

49.    Hospitals are categorized into levels of trauma care that generally correspond to each hospital's capability to handle various severity of injuries. Hospitals are categorized as follows:

- "A Level IV Trauma Center has demonstrated an ability to provide advanced trauma life support (ATLS) prior to transfer

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

8

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

of patients to a higher level trauma center. It provides evaluation, stabilization, and diagnostic capabilities for injured patients." American Trauma Center website at < https://www.amtrauma.org/page/traumalevels>

- "A Level III Trauma Center has demonstrated an ability to provide prompt assessment, resuscitation, surgery, intensive care and stabilization of injured patients and emergency operations." *Id.*

- "A Level II Trauma Center is able to initiate definitive care for all injured patients." *Id.*

- A Level I Trauma Center is the highest such designation: "Level I Trauma Center is a comprehensive regional resource that is a tertiary care facility central to the trauma system. A Level I Trauma Center is capable of providing total care for every aspect of injury – from prevention through rehabilitation." *Id.*

50.     The Phoenix Metropolitan area includes only ten Level I Trauma Centers that stretch from Goodyear in the west to Mesa in the east.

51.     Of the ten Level I Trauma Centers in the Phoenix Metropolitan area, HonorHealth operates three of them, exclusively covering a geographic area encompassing north Phoenix and all of Scottsdale—and covering the area where Oasis operates.

52.     Furthermore, HonorHealth has tools and capabilities that go above and beyond the criteria required for Level I care.

53.     When a patient is severely injured, the notion of "consumer choice" no longer applies. Instead, if the injuries are severe, the patient is taken to the nearest Level I Trauma Center.

54.     For emergency room consults and surgeries related to traumatic bone, ligament, and tendon on the foot and ankle, HonorHealth completely controls the market within its geographic footprint. Accordingly, in terms of the services listed in this Complaint, trauma patients do not choose HonorHealth: circumstances dictate that patients with traumatic injuries sustained in north Phoenix and Scottsdale must go to HonorHealth.

55.     Trauma surgery is the most crucial patient care. In the event of trauma to the bones, ligaments and tendons of a person's foot and ankle, the treating doctor is frequently required to use his or her utmost skill because the patient's lower extremities are at risk of amputation. Thus, for many patients, the ability to walk in the future, the ability to walk without prosthetics or bulky braces, or even the patient's life is at risk.

56.     Indeed, because this care is so critical, emergency department and traumatology staff is customarily provided the freedom to consult experts in any necessary field. As such, prior to the conspiracy that is the subject of this Complaint, the John C. Lincoln Health Network's emergency department and traumatology staff routinely asked Oasis doctors to be consulting physicians on foot and ankle injuries, often in an effort to save limbs.

57.     Because of the high stakes involved, trauma care represents the last kind of care where hospital systems can afford to freeze out skilled doctors or conspire with large consortiums of doctors to undermine competition. The end result of such actions is a distortion of the competitive market and, more importantly, a decline in patient care.

58.     Unfortunately, the economics of trauma care make it a common target for anticompetitive behavior, as patients are often treated at a hospital that is outside of their insurance network.

59.     The upshot is that physician organizations like the Orthopedist Defendants prioritize obtaining all of the available trauma call, consultations and surgeries from hospital systems like HonorHealth, even resorting to anticompetitive behavior to freeze other healthcare providers out of obtaining surgical privileges and handling trauma call and consultations—irrespective of whether or how patient care might be eroded.

60.     Worse, in the event of traumatic injury to the leg, foot or ankle, below-the-knee amputation is often the most lucrative procedure, and the quickest to

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

perform. In contrast, specialized limb-saving procedures performed by Oasis's podiatrists are more difficult and time-consuming, but can also be less lucrative— raising the spectre of hospitals that are incentivized to interfere with podiatrists who seek to perform trauma consultations and call rotations.

61.    In this case, the Orthopedist Defendants and HonorHealth have conspired to make sure that trauma care, consultations and surgeries for bone, tendon and ligament injuries of the foot and ankle went to the Orthopedist Defendants (and other private-practice orthopedic surgeons) by shutting out Oasis—even if it meant diminishing patient care. The result of the conspiracy is a group boycott of podiatrists meant to benefit the Orthopedist Defendants.

### The Merger That Created HonorHealth

62.    To understand how the Orthopedist Defendants and HonorHealth were able to conspire and the resulting, deleterious effect on the market, some background on the merger between Scottsdale Healthcare and John C. Lincoln Health Network is necessary.

63.    Prior to at least October 2013, Scottsdale Health and John C. Lincoln Health Network were two separate hospital networks.

64.    The former John C. Lincoln hospitals included Deer Valley Medical Center, located in northern Phoenix, and John C. Lincoln Medical Center, located in the central Phoenix neighborhood of Sunnyslope.

65.    The three former Scottsdale Healthcare hospitals included Scottsdale Osborn Medical Center, Scottsdale Shea Medical Center and Scottsdale Thompson Peak Medical Center, all located within the City of Scottsdale.

66.    In 2014, the two hospital groups affiliated, and in March 2015, the combined five-hospital organization officially merged and rebranded as HonorHealth.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

67.     The merger gave HonorHealth a massive geographical footprint in which it had exclusive control over virtually all trauma care, consultations and surgeries for bone, tendon and ligament injuries requiring Level I care.

68.     According to news reports, "[t]he combined organization has $1.6 billion in assets, 10,500 employees, 3,700 affiliated doctors and 3,100 volunteers." <https://www.azcentral.com/story/money/business/2015/03/30/scottsdale-lincoln-health-network-renamed-honorhealth/70704144/>

**The Oasis Agreement**

69.     In 2013, prior to the merger, Oasis entered into an On-Call Agreement with the John C. Lincoln Health Network. That agreement automatically renewed annually unless one side provided notice of termination.

70.     Between 2013 and 2015, Oasis doctors routinely responded to trauma call and consultations for foot and ankle emergencies at both John C. Lincoln Medical Center and Deer Valley Medical Center under the terms of the On-Call Agreement.

71.     For example, Dr. Brewer of Oasis responded to numerous traumatic foot and ankle consultations and surgeries (including complex orthopedic pediatric foot and ankle surgeries) at Deer Valley Medical Center. In multiple cases, Dr. Brewer's work prevented mid-foot, rear-foot an even below-the-knee amputations through the use of advanced limb-saving procedures.

72.     In addition, the John C. Lincoln Health Network's emergency department and traumatology staff routinely asked Oasis doctors to be consulting physicians on foot and ankle injuries. Oasis readily accepted these consult requests, and routinely made its orthopedic, vascular and plastic surgeons available round-the-clock for traumatic procedures at any John C. Lincoln facility.

73.     After the merger, on April 7, 2016, Oasis entered into an agreement with HonorHealth (the "Oasis Contract").

Kerssmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

12

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

74.     Under the Oasis Contract, HonorHealth "engage[d] [Oasis] to provide the Services . . . specified in this Agreement and [Oasis's] Podiatrists agree[d] to provide Services at John C. Lincoln Medical Center and Deer Valley Medical Center . . . ."

75.     Attachment 1 to the Oasis Contract is a "Statement of Work" that defines the services to be provided by Oasis.

76.     Under Provision 1.2.1, Oasis agreed to provide "On-Call Coverage," meaning that Oasis shall "provide on-call services for patients at the Emergency Department." This requires that Oasis's doctors "must be able to be present at the Hospital within thirty (30) minutes of being called." In order to meet these terms, Oasis must devote substantial resources to ensuring that doctors are always ready to provide excellent patient care for any kind of emergency.

77.     The Oasis Contract is for a one-year term and "automatically renew[s] for one additional one year term unless either Party provides written notice of its intent not to renew the Agreement at least ninety (90) days before the expiration of the then current term."

78.     Since it was executed, HonorHealth has never failed to renew the Oasis Agreement.

79.     But despite its contract with Oasis, since at least July 2018, HonorHealth refuses to allow its emergency department and traumatology staff to consult with Oasis's podiatrists (or any other podiatric surgeons) on lower-limb injuries to bone, ligament and tendons.

80.     The reason, as explained below, is simple: the anticompetitive conduct by defendants.

**Defendants' Anticompetitive Conspiracy**

81.     When the John C. Lincoln Health Network merged with Scottsdale Healthcare, Oasis's doctors had concerns about how the combined entity would treat doctors of podiatric medicine.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

82. Oasis did not have a contract with the former Scottsdale Healthcare, but Oasis's doctors were aware of Scottsdale Healthcare's treatment of podiatrists in the past.

83. Prior to the merger, a prominent, third-party doctor of podiatric medicine held several meetings with Scottsdale Healthcare regarding privileges and staffing.

84. Dr. Matthew Seidel is an orthopedic surgeon at Specialty Orthopaedic contracted with HonorHealth; he was formerly with Scottsdale Healthcare. Dr. Anthony Rhorer is the founding member of SOTS (though he no longer works at SOTS) and was the director of the orthopedic trauma at Scottsdale Healthcare. In 2010, both men flatly told the third-party podiatrist that doctors of podiatric medicine "would never get privileges" at Scottsdale Healthcare.

85. Scottsdale Healthcare backed up these statements with official policies formulated to exclude doctors of podiatric medicine. Two examples:

- Scottsdale Healthcare's bylaws stated that podiatrists were considered "affiliated staff." This designation meant that doctors of podiatric medicine could not hold office or even vote on any committee at Scottsdale Healthcare's hospitals.
- Furthermore, a checklist specific to doctors licensed in podiatry was enacted that made it impossible for podiatrist surgeons to obtain surgical privileges for injuries to lower-leg bones, ligaments and tendons, due to the sheer number of rare surgeries it required podiatric surgeons to have performed.

86. At the time of the merger, Oasis was concerned that the combined post-merger entity might adopt some of these same policies, thereby affecting Oasis's long-standing work at John C. Lincoln Medical Center and Deer Valley Medical Center.

87. But Oasis believed that its productive, long-standing relationship with the John C. Lincoln Health Network would mitigate this issue.

Kerosmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

88.     As stated above, on April 7, 2016 Oasis agreed to the Oasis Agreement with HonorHealth—seemingly validating Oasis's hopes for a continued relationship.

89.     But Oasis was also aware that the Orthopedist Defendants considered Oasis competition for bone, tendon and ligament surgeries on the foot and ankle.

90.     Furthermore, both Oasis and (at least) Defendant SOTS have contracts with HonorHealth.

91.     Despite Oasis's continued working relationship with HonorHealth, several private-practice orthopedic doctors made it clear to Oasis that they were working together to push Oasis out of HonorHealth's emergency rooms.

92.     In or around April 2015, Dr. Gregory Grant, a private-practice orthopedic surgeon at Foothills Orthapaedic Specialists, P.C. who is also contracted with HonorHealth, informed Dr. Brewer that he anticipated an expansion of Scottsdale Healthcare's policies for doctors of podiatric medicine to the former Lincoln Medical Centers, where Oasis had extensively worked.

93.     Indeed, Dr. Grant told Dr. Brewer that he was working with SOTS to convince Dr. Michael Piver, the Chair of Orthopedics for HonorHealth, that Scottsdale Healthcare's restrictive policies toward podiatrists *should* be exported to the former John C. Lincoln hospitals.

94.     In order to ensure that HonorHealth acted in the best interests of foot and ankle patients, Dr. Brewer met with staff from the HonorHealth hospitals and presented descriptions and documentation of his training, which included four months of emergency trauma surgery, four months of emergency general surgery, three months of running a burn emergency room and, post-residency, two years working with podiatric and orthopedic surgeons learning surgical procedures and limb-saving techniques. He also presented specific cases of limb-salvage and other complex orthopedic procedures.

95.     In response, HonorHealth sent Dr. Brewer an email explaining that it had decided to postpone any decisions related to privileges for doctors of podiatric

medicine and that he would be notified when the issue was ready to be addressed by HonorHealth. In that email, HonorHealth specifically told Dr. Brewer that Oasis would be allowed to provide input on whatever decision HonorHealth would make regarding its policies directed towards podiatrists.

96.     Upon information and belief, at the time of the email from HonorHealth, defendants had already begun discussions to exclude podiatrists from HonorHealth.

97.     At about the same time Dr. Brewer was attempting to work with HonorHealth to ensure qualified podiatric surgeons access to its emergency rooms on the same footing as orthopedic surgeons, the Orthopedic Defendants were actively working to deny podiatrists privileges at HonorHealth.

98.     In or around May 2015, in Sedona, Arizona, a retreat for orthopedic surgeons was held involving all of the HonorHealth hospitals.

99.     Upon information and belief, Dr. Michael Piver, associate vice president of the HonorHealth Orthopedic Service Line, attended the retreat. At the retreat, Dr. Piver met with several doctors from SOTS, including Dr. Brian Miller and other orthopedic doctors, to discuss ways to bar podiatrists from treating lower-limb bone, ligament and tendon emergencies in the HonorHealth system.

100.     Upon information and belief, at that retreat, defendants reached a collusive agreement to eliminate competition from podiatrists treating or consulting on bone, ligament and tendon emergencies in the HonorHealth system.

101.     That collusive agreement constituted a group boycott of podiatrists meant to stop podiatrists' competition from treating or consulting on bone, ligament and tendon emergencies in the HonorHealth system and preserving that work for the Orthopedist Defendants.

102.     Despite the anticompetitive agreement, on April 7, 2016, HonorHealth signed the Oasis Contract for Oasis to provide on-call services in the HonorHealth emergency departments.

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

103.   But soon after the Sedona retreat, in 2015 and early 2016, HonorHealth's committee responsible for delineating privilege standards held meetings regarding privileges for doctors of podiatric medicine without notifying anyone at Oasis. Rather, Oasis was told about the committee's decisions after-the-fact.

104.   Around that time, Regina Brewer, Donna Miller and Angie Arnett of HonorHealth told Dr. Brewer that HonorHealth's bylaws now prevented doctors of podiatric medicine from holding any office and voting on committees at HonorHealth (just as Scottsdale Healthcare's policies had, prior to the merger).

105.   Specifically, this meant that HonorHealth would enforce a policy that requires podiatrists seeking surgical staff privileges to have performed 175 enumerated surgical procedures within the last two years.

106.   In a checklist entitled "Podiatry Privileges" for the Department of Surgery, HonorHealth stated that "Podiatrists with appropriate training/experience are eligible to apply for the following special privileges, provided that applicable specific criteria are met including documentation of experience, including dates and numbers of procedures, at the discretion of the orthopedic subcommittee or surgery committee. Please submit procedure reports for # of cases required per time period for initial appointment or reappointment (every two years)."

107.   The Podiatry Privileges Checklist then listed out several procedures, requiring that podiatrists seeking privileges for the first time had to have conducted thirty (25) surgeries in the previous two years for *each* procedure.

108.   The surgical procedures are: (1) Ankle Arthroscopy, (2) Achilles Tendon Repair & Lengthening, (3) Ankle Arthrodesis, (4) Foot & Ankle ORIF (Open Reduction Internal Fixation), (5) Rear-Foot Osteotomes & Fusions, (6) Mid-Foot Osteotomes  & Fusions, and (7) Soft Tissue Reconstructive Procedures From The Distal Third Of The Tibia / Fibula Region.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

17

109.   In other words, HonorHealth requires a podiatrist seeking surgical privileges to provide procedure reports for *175 different procedures* (which must be evenly distributed across the various enumerated procedures) in order to obtain privileges at HonorHealth.

110.   Upon information and belief, given the relative rarity of traumatic lower-limb surgeries performed across the entire State of Arizona every two years, reporting 175 different surgical procedures (including not less than thirty of each specific one) is impossible.

111.   Quite obviously, HonorHealth set its requirement for the specific surgeries at a high level to prevent podiatrists from qualifying for surgical privileges.

112.   Upon information and belief, HonorHealth was well aware that obtaining surgical privileges under its Podiatry Privileges Checklist would prove impossible.

113.   Worse, HonorHealth does not require orthopedic doctors (including surgeons from the Orthopedist Defendants) to have performed the same 175 procedures in order to obtain staff privileges—or they too would be unable to qualify for surgical privileges.

114.   Indeed, upon information and belief, HonorHealth set the requirements of the Podiatry Privileges Checklist at the behest of and in conspiracy with the Orthopedist Defendants in order to give the Orthopedist Defendants a competitive advantage.

115.   Furthermore, the Podiatry Privileges Checklist explicitly gave the committees wide discretion in evaluating the submitted applications: "As each special procedure is unique, documentation of experience, including dates and numbers of procedures, will be determined at the discretion of the Orthopedic Subcommittee or the Surgery Committee, based upon the demonstrated training and experience of the applicant and the special procedure being requested."

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

116.    Numerous doctors employed by the Orthopedist Defendants sit on the cited Orthopedic Subcommittee and the Surgery Committee given "discretion" to reject even qualified applicants.

117.    Upon information and belief, Dr. Laura Prokuski, a surgeon with SOTS and the Chair of Surgery at Lincoln Medical Center, Dr. Brian Miller, a surgeon with SOTS and contracted at HonorHealth Osborn, and Dr. Gregory Grant of Foothills and contracted at HonorHealth Shea, were involved in the promulgation of the Podiatry Privileges Checklist that prevents doctors of podiatric medicine from performing foot procedures (among other procedures) at HonorHealth.

118.    Unaware of defendants' agreement to eliminate competition from podiatrists and enact a group boycott, Oasis believed it was possible to challenge HonorHealth's bylaws. Oasis had provided valuable services to the former John C. Lincoln hospitals and had a contract with HonorHealth.

119.    Accordingly, in response to these policies, Dr. Brewer contacted the ACFAS regarding HonorHealth's newly implemented polices.

120.    In June 2015, the AFCAS sent a certified letter to HonorHealth regarding the legality of their privilege requirements for doctors of podiatric medicine. But HonorHealth never responded to the letter—or changed any of its policies.

121.    Dr. Brewer's hope following the ACFAS letter was to educate HonorHealth's leadership regarding how doctors of podiatric medicine's board certification differed from medical doctors.

122.    Essentially, for board certification in surgery, doctors of podiatric medicine must obtain the qualifying surgical procedures in the first seven years *following* their residency—*i.e.*, surgeries performed during their residency cannot be included for purposes of board certification. But medical doctors specializing in orthopedics are typically board certified immediately after completing residency (and

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

passing a written test) because their in-residence surgeries *do* count for certification purposes.

123.    Instead of formulating its bylaws to accommodate the differences in certification, upon information and belief, HonorHealth deliberately adjusted its bylaws to use these otherwise minor differences to *exclude* doctors of podiatric medicine from surgical privileges.

124.    Specifically, HonorHealth changed its bylaws so that "Board Qualified" podiatric surgeons are no longer permitted to obtain privileges until *after* they become board *certified*.

125.    But this bylaw creates a Catch-22, wherein podiatrists, despite being board qualified, cannot obtain the surgical cases they need for board certification—and board certification is necessary to obtain surgical privileges at HonorHealth.

126.    Plaintiff in this lawsuit contends that the Catch-22 is intentional, and was put in place only for anticompetitive reasons.

127.    Despite these obstacles, the emergency department staff and traumatologists at the former John C. Lincoln hospitals continued to consult Oasis doctors on foot and ankle trauma; these doctors plainly recognized the invaluable nature of the expertise of Oasis's doctors.

128.    From 2018 forward, defendants stepped up their anticompetitive behavior, with the ultimate effect of freezing Oasis's podiatrist out of the Emergency Department at every HonorHealth facility.

129.    In the summer of 2018, Dr. Prokuski—herself an elbow specialist—told at least one patient that doctors of podiatric medicine are "not qualified" to perform foot and ankle surgeries while working at HonorHealth.

130.    In other words, she has acted to deny patients their choice of doctor—to her company's competitive advantage—based on policies that she helped orchestrate.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

131.   Furthermore, Dr. Prokuski held meetings with the Emergency Department staff and all of the General Surgery residents of HonorHealth. At those meetings, she informed HonorHealth's emergency room physicians and traumatologists that they were no longer permitted to consult doctors of podiatric medicine on any foot injuries (including small toe fractures), because doctors of podiatric medicine were "not qualified" to perform repairs upon the bones, ligaments and tendons of the foot and ankle.

132.   Dr. Prokuski's broad and biased statement has no basis in the truth.

133.   Prior to Dr. Prokuski's decree, HonorHealth's Emergency Department staff and traumatologists had always had freedom to consult whichever physician they deemed appropriate for their patients. Many HonorHealth Emergency Department staff and traumatologists had routinely consulted Oasis doctors on foot and ankle trauma.

134.   Patient care suffered as a result of the Orthopedist Defendants' aggressive anticompetitive conduct.

135.   For example, in August 2018, Dr. Garza, an Oasis doctor, received a call from an emergency room provider at Lincoln Medical Center regarding a patient with two metatarsal fractures. He accepted the consult and was en route to the emergency room when Dr. Francis Ali-Osman contacted Dr. Garza and informed him that Dr. Garza could no longer see the consult. Instead, a surgeon from SOTS (the late Dr. Thomas Fischler) took the patient to surgery.

136.   Upon information and belief, Dr. Prokuski intervened to inform Dr. Ali-Osman that HonorHealth emergency physicians were not permitted to consult with a podiatrist for such injuries—even though Dr. Ali-Osman stated that he believed Oasis to be the most qualified physicians to treat the patient in question.

137.   In other words, an HonorHealth physician's professional judgment in calling Oasis was overruled by a SOTS doctor who instead directed the consultation and surgery to a hip specialist from SOTS.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

138.   Of course, both doctors could have been consulted; instead, a SOTS doctor overruled the discretion of HonorHealth's staff physician by directing the consultation to the private-practice surgeon's own business.

139.   In February 2019, Oasis's doctors learned that the Osborn Medical Center did not have enough physicians to treat lower-limb fractures. Oasis immediately provided their doctors' call schedule to that hospital, expecting Oasis's podiatric surgeons could and would be permitted to see the untreated patients.

140.   But Regina Brewer of HonorHealth's medical staffing department informed Oasis that its doctors could not provide on-call surgeons to the hospital.

141.   Further, Dr. Grant (of Specialty Orthopaedics) told Dr. Brewer that all on-call doctors of podiatric medicine would have to be "pre-approved" by Dr. Miller's (of SOTS) committee—and that "no such approval would ever take place."

142.   While defendants have prevented Oasis from conducting foot and ankle bone, tendon and ligament surgeries at HonorHealth emergency departments (or consulting on the same), Dr. Prokuski told Dr. Brewer that Oasis doctors were free to do "all the [foot and ankle] skin grafts they want."

143.   In other words, the defendants conspired to keep Oasis from competing with the Orthopedist Defendants for foot and ankle bone, ligament and tendon surgeries while leaving Oasis with the work in which the Orthopedist Defendants had no interest.

144.   HonorHealth excludes doctors of podiatric medicine not because it is good for patients; indeed, HonorHealth's exclusionary practices hurt patients.

145.   The anti-competitive conduct described herein has harmed patients in the relevant market. In this case, those patients are severely injured, and are denied care they would otherwise receive from Oasis and other well-qualified doctors of podiatric medicine.

146. Upon information and belief, and according to a statement from Dr. Grant, the Osborn Medical Center does not have enough physicians to treat foot and ankle fractures.

147. Upon information and belief, and according to a statement from Dr. Grant, there have been numerous occasions where patient wait-time for traumatic injuries to the bones, ligaments and tendons of the lower extremities exceeded the 30-minute threshold for Level I care.

148. Despite the lack of physicians and the fact that HonorHealth has a contract with Oasis for this very care, HonorHealth prohibits its emergency department and traumatology staff from consulting with Oasis's qualified podiatric surgeons at its Emergency Departments.

149. These failures are due to a conspiracy with the Orthopedist Defendants designed to give the Orthopedist Defendants a competitive advantage—regardless of the impact on patient care.

150. In some cases, patients have received a mid-foot, hind-foot or below-the-knee amputation that could have been prevented had the patient received access to Oasis's limb-saving team of podiatrists.

151. In other cases, patients have not received prompt attention from physicians qualified to perform lower-limb evaluation and surgery, while others have been sent to painful and expensive rehabilitation instead of receiving an immediate, warranted surgery.

152. Moreover, Oasis's exceptional skills and techniques potentially could: (i) reduce the post-operative length of a patient's hospital stay by days, weeks or even months for certain highly complex procedures; (ii) dramatically reduce medical costs as a result of so reducing post-operative hospital stays; and (iii) make available certain complex procedures that have not otherwise been available at HonorHealth.

153. As a result, defendants' unlawful actions have damaged not only Oasis, but also injure competition to the detriment of trauma patients across north Phoenix

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

and Scottsdale, and the insurers and government sources of funding that pay for their medical care.

**First Claim for Relief**

**(Conspiracy in Restraint of Trade, 15 U.S.C. § 1 – against all Defendants)**

154.    Oasis hereby incorporates the paragraphs above, each as though fully set forth herein.

155.    Beginning in 2015 and continuing through the present, HonorHealth and the Orthopedist Defendants have conspired to prevent Oasis from obtaining privileges for Level I Trauma Care at HonorHealth's hospitals and from consulting on the same.

156.    HonorHealth has acted with discriminatory intent, while the Orthopedist Defendants have been motivated by their desire to suppress competition for Level I Trauma Care services for their own professional and economic benefit.

157.    On information and belief, HonorHealth agreed to support the Orthopedist Defendants in their anti-competitive efforts because the doctors HonorHealth permitted to determine its policies, like Drs. Miller and Prokuski, had a competitive motivation to exclude podiatrists.

158.    HonorHealth ignored this conflict of interest and acceded to the anticompetitive desires of its surgical staff, to the detriment of both competition and patient care.

159.    On information and belief, Drs. Miller, Prokuski, and Grant used their influence and power within HonorHealth to convince HonorHealth to support their anti-competitive efforts. HonorHealth has in fact supported the anti-competitive efforts by: (i) reducing patient and physician choice; (ii) on information and belief, increasing wait times; (iii) on information and belief, increasing the length of post-operative hospital stays; (iv) on information and belief, increasing medical costs; (v) affecting payments to and from those who pay for their services (including out-of-state insurers and federally-funded insurance programs); (vi) affecting payments to

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

other interstate entities including pharmaceutical and medical device companies; and (vii) engaging in other unlawful anti-competitive conduct to Oasis' detriment and the detriment of patients.

160.    Accordingly, the Orthopedist Defendants and HonorHealth combined and conspired with one another to deny Oasis staffing privileges for Level I Trauma Care and consultations on the same, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

161.    As a result of the combination and conspiracy, trade has been restrained, as the public has been deprived of free and open competition in Level I Trauma Care at HonorHealth's hospitals.

162.    This combination and conspiracy has resulted in longer patient wait times, and, on information and belief, longer post-operative patient hospital stays and higher payer costs, all of which could be reduced if Oasis (and podiatric surgeons generally) were not illegally restrained from trade.

163.    HonorHealth and the Orthopedist Defendants are each liable to Oasis for the actions of their agents, under the theory of agency.

164.    Oasis has suffered, is suffering, and will continue to suffer, extensive harm to its professional reputation and goodwill.

165.    Oasis has suffered, is suffering and will continue to suffer, damages cognizable under Section 1 of the Sherman Act.

166.    Oasis is entitled to recover threefold the damages it has sustained.

167.    Oasis is entitled to recover the cost of this suit, including but not limited to its attorney's fees.

### Second Claim for Relief

### (Tortious Interference with Prospective Economic Relations – against Orthopedist Defendants)

168.    Oasis hereby incorporates the paragraphs above, each as though fully set forth herein.

169.    In an attempt to divert trauma work away from Oasis, the Orthopedist Defendants and its doctors manipulated the policies of HonorHealth, including but not limited to informing HonorHealth's emergency room and traumatology staff that they could not or should not consult with Oasis's doctors.

170.    Prior to the Orthopedist Defendants' actions, Oasis routinely received consultation requests and surgical referrals at John C. Lincoln Medical Center and Deer Valley Medical Center.

171.    The Orthopedist Defendants knew their actions would eliminate Oasis as competitors for that work.

172.    The Orthopedist Defendants intentionally forced the exclusion of Oasis's podiatrists from HonorHealth's emergency room and traumatology consultations and surgical referrals in order to enrich itself—even at the expense of patient care.

173.    The conduct of the Orthopedist Defendants was improper because, *inter alia*, the Orthopedist Defendants cannot provide the scope, quality and price of care that Plaintiff and other qualified podiatric surgeons can, and because such conduct constitutes illegal restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

174.    The conduct of the Orthopedist Defendants was improper because, *inter alia*, the Orthopedist Defendants cannot provide the scope, quality and price of care that Plaintiff and other qualified podiatric surgeons can, and because such conduct constitutes illegal restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

175.    The Orthopedist Defendants intentionally sought to damage Oasis's business relationship with HonorHealth and individual patients.

176.    As a result of the Orthopedist Defendants' wrongful conduct, Oasis has been damaged in an amount to be proven at trial.

**Third Claim for Relief**

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

**(Common Law Unfair Competition – against the Orthopedist Defendants)**

177.   Oasis hereby incorporates the paragraphs above, each as though fully set forth herein.

178.   "The general purpose of the doctrine is to prevent business conduct that is 'contrary to honest practice in industrial or commercial matters.'" *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 124 (Ct. App. 1998) (quoting *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)).

179.   The Orthopedist Defendants' conduct constitutes unfair competition under the common law of the State of Arizona.

180.   The Orthopedist Defendants' unfair competition with Oasis has caused direct harm to Oasis.

181.   The Orthopedist Defendants' actions were committed fraudulently and maliciously and in conscious disregard of Oasis's rights, with evil mind and intent to injure Oasis.

182.   An award of punitive damages should be entered against the Orthopedist Defendants to deter those similarly situated.

### Fourth Claim for Relief

**(Discrimination Against Podiatrists in Violation of A.R.S. § 36-435 – against Defendant HonorHealth)**

183.   Oasis hereby incorporates the paragraphs above, each as though fully set forth herein.

184.   Arizona law dictates, "The governing board of each health care institution classified by the director as a hospital pursuant to section 36-405, subsection B shall provide for the use of the health care institution by, and staff privileges for, duly licensed podiatrists subject to nondiscriminatory rules and regulations governing the use or privileges established by the governing board and medical staff for persons licensed under title 32, chapter 7, 13 or 17."

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

27

185.   HonorHealth implemented and maintains policies, rules and regulations for surgical privileges at its hospitals that are discriminatory toward podiatrists.

186.   As the result of HonorHealth's illegal conduct, Oasis has been damaged in an amount to be proven at trial.

**Jury Trial Demanded**

187.   Oasis requests a jury trial for all issues triable by a jury.

**Prayer for Relief**

WHEREFORE, for the foregoing reasons, Oasis Foot & Ankle, LLC prays for relief against defendants Scottsdale Healthcare Hospitals d/b/a HonorHealth, Sonoran Orthopaedic Trauma Surgeons, P.L.L.C., Foothills Orthopaedic Specialists, P.C. and Mallin & Seidel Orthopaedic Oncology, an Arizona professional limited liability company L.L.C. d/b/a Specialty Orthopaedic Surgery as follows:

  a.   For compensatory damages as result of defendants' tortious conduct;

  b.   For treble damages under the Sherman Act;

  c.   For attorneys' fees under the Sherman Act;

  d.   Under Claims for Relief 1-4, compensatory damages in amount to be determined at trial;

  e.   Under Claim for Relief 3, for punitive damages in an amount sufficient to punish the Orthopedist Defendants and to deter them and others similarly situation from engaging in similar conduct;

  f.   For Oasis's costs and attorneys' fees under the Sherman Act;

  g.   Prospective relief available under the Sherman Act, to the extent applicable; and,

  h.   For such further relief as this Court deems just and proper.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

DATED this 24th day of February, 2020.

KERCSMAR & FELTUS PLLC


By: s/ Geoffrey S. Kercsmar

Geoffrey S. Kercsmar
Sean J. O'Hara
Eric B. Hull
7150 E. Camelback Road, Suite 285
Scottsdale, Arizona 85251

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

# EXHIBIT 1



## PROFESSIONAL SERVICES AGREEMENT
## BETWEEN
## HONORHEALTH
## AND
## OASIS FOOT AND ANKLE CENTER, LLC

THIS AGREEMENT (the "**Agreement**") is made and entered into as of the 7th day of August 2016 ("**Effective Date**") by and between HonorHealth ("**Network**"), an Arizona non-profit corporation, and Oasis Foot and Ankle Center, LLC ("**Group**"), an Arizona limited liability company.  Network and Group may be individually referred to hereinafter as "**Party**" or collectively as "**Parties.**"

### RECITALS

WHEREAS,  Network owns and operates Scottsdale Osborn Medical Center, Scottsdale Shea Medical Center, Scottsdale Thompson Peak Medical Center, Deer Valley Medical Center, Sonoran Health and Emergency Center, and John C. Lincoln Medical Center.  Scottsdale Osborn Medical Center and John C. Lincoln Medical Center are designated as Level 1 Trauma Centers. Deer Valley Medical Center is designated as a Level III Trauma Center; and

WHEREAS, John C. Lincoln Health Network and Oasis Foot and Ankle Center entered into an On-Call Agreement dated November 22, 2013 ("**2013 Agreement**") and a First Amendment to On-Call Agreement dated May 20, 2014 ("**2014 Amendment**") for the provision of Services at Deer Valley Medical Center; and

WHEREAS, John C. Lincoln Health Network and Oasis Foot and Ankle Center entered into an On-Call Agreement dated May 29, 2014 ("**2014 Agreement**") for the provision of Services at John C. Lincoln Medical Center; and

WHEREAS, Group employs (part- or full-time) or has member (owners, partners, unit holders or shareholders) physicians who are doctors of podiatry licensed in the State of Arizona and practicing in the field of Podiatry (each a "**Podiatrist**" and collectively "**Podiatrists**"); and

WHEREAS, in order to operate its emergency department(s) and maintain its designation as  Level 1 and Level III Trauma Centers in the state of Arizona, Network must make available to its patients certain Podiatry services, including services that qualified Podiatrists employed by Group can provide; and

WHEREAS, Network wishes to engage Group to provide the Services (as defined herein Attachment 1) specified in this Agreement and Group's Podiatrists agree to provide Services at John C. Lincoln Medical Center and Deer Valley Medical Center (individually referred to hereinafter as "**Hospital**" or collectively as "**Hospitals**") on the terms and conditions set forth in this Agreement; and

1

WHEREAS, the Parties hereby agree, as of the effective date of this Agreement, to terminate the 2013 Agreement, the 2014 Amendment, and the 2014 Agreement and replace them in their entirety with this Agreement.

## AGREEMENTS

THEREFORE, and in consideration of the mutual promises and covenants hereinafter contained, the Parties, intending to be legally bound, hereby agree as follows:

1.    Scope of Agreement. This Agreement allows the Parties to specify distinct Services to be provided by Group to Network patients through the issuance of multiple individual statements of work between Network and Group setting forth the specific Services to be provided and the context in which the Services will be provided, a form of which is attached hereto as Attachment 1 ("**Statement of Work**"). The specific details and Services to be provided as well as the payment schedule, if any, for the Services shall be separately negotiated and specified in writing in each Statement of Work.  Each Statement of Work shall be subject to all the terms and conditions of this Agreement, in addition to the specific details set forth in the Statement of Work.

2.    Group Responsibilities.  In providing Services, Group agrees as follows:

2.1    Group Podiatrists.  Group shall employ at their discretion qualified Podiatrists to provide Services to Network's patients. The number of Podiatrists available to provide Services shall at all times be sufficient to provide high quality, timely and cost effective services consistent with the provisions of this Agreement and consistent with similar services customarily provided by other podiatrists in like or similar facilities.

2.2    Other Non-Physician Providers.   The Parties acknowledge that Group may employ non-physician providers qualified to assist in the provision of Services ("**Non-Physician Providers**").  Group acknowledges and agrees that the use of Non-Physician Providers shall not alter any obligation of Group to provide Services through Podiatrists under this Agreement. If Group employs Non-Physician Providers, Group shall require and assure that all Non-Physician Providers comply with all terms of this Agreement to the same extent as if such Non-Physician Providers were Podiatrists. However, with respect to licensure requirements, all Non-Physician Providers will hold the Arizona licenses necessary for the provision of their services and shall satisfy such other requirements as Network may require pursuant to its policies and Medical Staff bylaws for Non-Physician Providers.

2.3    Services.   Group shall ensure that the Podiatrists perform such Services in accordance with the standards and provisions of this Agreement and in accordance with Network policies and procedures and the Medical Staff Bylaws and rules and regulations.  Group shall provide the Services on an equal basis to all Network patients requiring such Services, including any indigent patients or patients who are covered by Medicare or AHCCCS (as defined herein) programs or other federal or state assistance programs and shall in no way discriminate based upon gender, race, color, sexual preference, age or national origin. Group shall comply with, and shall ensure that all Podiatrists comply with, all applicable federal, state, and local laws, rules

regulations, and restriction in the conduct of Services, including without limitation, the federal anti-kickback state, the federal false claims act and the Stark self-referral law.

2.4     Staffing.   Group shall provide appropriate Podiatrist staffing to ensure that Services are available as identified in each Statement of Work attached hereto. Group will increase or decrease the number of Podiatrists at a particular site as necessary to appropriately staff for increased or decreased patient volume, to meet the agreed upon performance standards, to meet Network and/or a specific department's or facility's strategic growth plan, or to meet customer demands for improved service offerings.

2.5     Quality Improvement, Utilization Management and Risk Management.   Group, through its Podiatrists shall participate as reasonably requested by Network in the quality review, utilization review, risk management, infection control, and other medical programs at Network to improve the efficiency and quality of the Services. Group, through its Podiatrists, shall cooperate with Network in complying with Network's quality management programs, including such standards referenced in a particular Statement of Work, and all Centers for Medicare and Medicaid Services ("CMS") conditions of participation and/or state regulations. Podiatrists will participate in the design, implementation and coordination of the Continuous Quality Improvement programs of Network as those programs relate to patient care practices, discharge planning, education, patient record documentation, regulatory compliance, intra-professional cooperation, interdisciplinary communication, patient and family satisfaction, payor satisfaction and related matters. Group's participation in Network's quality management program shall include reasonable and appropriate participation in the following: (1) peer review and other quality reviews, (2) patient safety and risk management initiatives related to Services, (3) ongoing monitoring and evaluation of the quality and efficiency of the  Services at Network in collaboration with Network's leadership, (4) compliance with infection control practices as established by Network, (5) compliance with Network's Medical Staff credentialing policies, Medical Staff and Network policies and procedures, applicable accrediting and licensing organizations, and (6) any other activities that may be mutually agreed upon by the Parties.

2.6     Compliance with Laws, Bylaws, Policies and Procedures.   Group and its Podiatrists shall cooperate fully with Network in all required state licensure, Medicare and AHCCCS certification, CMS requirements and other programs and provide all Services in compliance with all applicable requirements.

2.7     Group and Podiatrist Qualifications.

(a)     Licensure, Medical Staff Membership and Board Certification.   Group shall ensure that each and every Podiatrist providing Services under this Agreement, and any Statement of Work, shall:

(1)     Maintain an Arizona license to practice medicine with no restrictions or suspensions that would prevent the Podiatrist from providing Services under this Agreement,

3

(2)     Be a member of one of Network's Medical Staffs and at and all times remain in good standing, with unrestricted clinical privileges necessary to provide Services under this Agreement, and

(3)     Be board certified or board eligible in the specialty(s) necessary to provide Services under this Agreement.

(b)     Other Qualifications, Representations and Warranties.  Group expressly represents and warrants that it and each and every Podiatrist who may provide Services under this Agreement or any Statement of Work attached hereto:

(1)     Shall be participating providers in good standing, without limitation or exclusion, under the Medicare and Medicaid (in Arizona, the Arizona Health Care Cost Containment System, or "**AHCCCS**") programs and other federal or state assisted healthcare programs and shall accept assignment under Medicare, AHCCCS and such programs.

(2)     (i) have not been suspended, excluded, or debarred under Medicare, AHCCCS or any other federal or state assisted program; (ii) have not been placed on the sanctions list issued by the Office of the Inspector General of the Department of Health and Human Services pursuant to the provision of 42 U.S.C. § 1320a(7) or have not been excluded from government contracts by the General Services Administration, or (iii) have not been convicted of a crime relating to healthcare or a felony.

(c)     Notice to Network.  Group shall give Network immediate written notice once Group becomes aware of any failure by Group or any of its Podiatrists or its Non-Physician Providers to meet the requirements of this Section or any threat to impose the sanctions stated above by any governmental authority having jurisdiction.  The notice shall contain reasonably sufficient information to allow Network to determine the nature of the action, failure, sanction or conviction.  Group represents and warrants that it has policies and procedures in place requiring Podiatrists to timely provide notice to Group of any failure to meet the requirements of this Section or of any threat to impose the sanctions stated above by any governmental authority having jurisdiction.

3.     Network's Responsibilities.  Network shall be responsible for providing the following:

3.1     Licensure, Certification and Accreditation.  Network shall maintain all licenses and certifications necessary for the operation of all relevant Network Facilities and departments under Arizona law and as required for Network to participate in the Medicare and AHCCCS Programs and other federal and state assisted programs.

4.     Fees for Services; Reimbursement and Payers.

4.1     Payment for Services.  Network shall pay Group for the performance of Services under the applicable Statement of Work in accordance with the payment schedule, if any, in the applicable Statement of Work.

4

4.2 <u>Network Billing</u>. Except as stated otherwise in a Statement of Work, Network shall be responsible for billing patients, responsible parties or entities, or third party payers for professional Services provided by Group and Podiatrists under this Agreement, for the facility or technical component of Services, including without limitation, the use of equipment, supplies, facilities and Network personnel, and shall do so in accordance with applicable federal and state laws and regulations. Neither Group nor any Podiatrist shall bill patients, responsible third parties or entities, or any third party payer for these Network services and Network shall be entitled to retain all amounts collected for such services for its sole account. Consistent with applicable laws, Group shall provide to Network or its billing agent patient information regarding Services to be billed, in a format and scope agreed to by Group and Network, as reasonably required for Network to bill for such services.

4.3 <u>Adjustments</u>. It is understood and agreed that by mutual agreement Network and Group may, on a case-by-case basis, and only in compliance with applicable laws and regulations (including, without limitation, laws, regulations, rules and guidance established by the CMS regulating such activity), adjust, discount, or waive fees for Services performed for any patient that qualifies for such pursuant to Network policy.

5. <u>Term and Termination</u>.

5.1 <u>Term of Agreement</u>. This Agreement shall commence on the Effective Date for an initial term of one (1) year (**"Initial Term"**). This Agreement shall automatically renew for one additional one (1) year term unless either Party provides written notice of its intent not to renew the Agreement at least ninety (90) days before the expiration of the then current term. The Parties understand and agree that if this Agreement is terminated with or without cause during the Initial Term, the Parties will not enter into a subsequent agreement with each other for the same or substantially the same matter until one (1) year after the Effective Date.

5.2 <u>Termination without Cause</u>. This Agreement may be terminated for any reason by either Party without liability by providing at least ninety (90) days prior written notice to the other Party.

5.3 <u>Termination for Cause</u>. Either Party shall have the right to terminate this Agreement at any time for any material breach of the terms or conditions of this Agreement by the other Party if such breach is not cured by the Party committing the breach within sixty (60) days after written notice has been given by the Party claiming that a material breach has been committed. Such notice shall describe the nature of the material breach. If Network seeks termination under this Section because of a Podiatrist's breach of this Agreement, Group may cure such breach by promptly removing Podiatrist from participation under this Agreement and replacing such Podiatrist within ten (10) days. Termination for cause shall include, but not be limited to the following.

(a) Network's right to terminate:

(1) Revocation, restriction, suspension or termination of any Podiatrist's license to practice medicine, or any formal disciplinary action or censure of

5

any Podiatrist as a final act of any state medical licensing authority which would impede Podiatrist's ability to provide services pursuant to this Agreement;

      (2)    Revocation, suspension or termination of a Podiatrist's Medical Staff membership and any of Podiatrist's clinical privileges at any Network Facility;

      (3)    Any of the following actions against Group, any Podiatrist, or any corporate member or employee of Group: (i) suspension, exclusion, or debarment under Medicare, AHCCCS or any other federal or state assisted program; (ii) placement on the sanctions list issued by the Office of the Inspector General of the Department of Health and Human Services pursuant to the provisions of 42 U.S.C. § 1320a(7) or exclusion from government contracts by the General Services Administration; (iii) conviction of a crime relating to healthcare or a felony; or (iv) acts which could reasonably be construed as moral turpitude;

      (4)    Failure on the part of Group to maintain malpractice insurance for Group and Podiatrist required under this Agreement;

      (5)    Breach of Group's obligations, dealing with the HIPAA Privacy Standards, as applicable;

      (6)    Any member of Group or its Podiatrists is determined by Network to be incompatible with the organization and, subsequent to a shared action plan mutually developed to correct such, is not followed; or

      (7)    Group fails to achieve the quality requirements and standards included in a Statement of Work for two (2) consecutive quarters.

    (b)    Group's right to terminate:

      (1)    Revocation, restriction, suspension or termination of Network's license to operate one or more Network facility as a final act of the appropriate state licensing authority; or

      (2)    Network's (i) suspension, exclusion, debarment under Medicare, AHCCCS or any other federal or state assisted program; (ii) placement on the sanctions list issued by the Office of the Inspector General of the Department of Health and Human Services pursuant to the provision of 42 U.S.C. (7) or exclusion from government contracts by the General Services Administration, or (iii) conviction of a crime relating to healthcare or a felony.

    5.4    <u>Termination of a Statement of Work</u>.  A Statement of Work may be terminated for any reason by either Party without liability by providing at least ninety (90) days prior written notice to the other Party.

5.5     Change of Control.  If either Group or Network undergoes a "change of control" as described in this Section, such Party shall, within thirty (30) days of the effective date of such change of control, provide written notice to the other Party of the change in control. Within 6 months from the date of the notice such Party may provide to the changed Party written notice of termination of this Agreement and such termination shall be effective at the end of ninety (90) days from the date of such notice of termination.  For the purpose of this Section, "change of control" means with respect to Network and Group (each a "**Party**"):

(a)     A merger or consolidation of a Party with another entity, regardless of which entity is the survivor in the transaction; (b) a sale of substantially all of the assets of a Party in one or more transactions; (c) the sale, transfer or other disposition of more than 50% of the shares, memberships or other ownership interests of a Party, as may be applicable to that Party; (d) a change to the articles of incorporation, articles of organization, bylaws, operating agreement or other governing documents of a Party (or the Party's entering an agreement or other arrangement that has the same effect) that enables more than 50% of the board of directors of the Party to be elected, appointed or otherwise designated by a person or persons who do not have such power on the Effective Date of this Agreement; (e) with respect to Group, a change in more than 50% of the Podiatrists within a calendar year owning Group or employed by Group; or (f) a lease, operating agreement, management agreement or other arrangement pursuant to which use, control, management or responsibility for day-to-day operations of substantially all of the assets, business or affairs of a Party are leased, transferred or otherwise granted to another person.

Notwithstanding the foregoing, a change of control does not include any of the transactions described in clauses (a) through (f) or any other reorganization or recapitalization if the transaction is a reincorporation or re-domestication of the Party (or a change in the type of the entity, such as changing from being a corporation to being a limited liability company) involving no change in ownership or control of the Party

6.      Effect of Laws.  If any legislation, regulation or government policy is passed or adopted or if these laws, regulations or policies are interpreted in a manner that would materially affect either Party's participation in or implementation of this Agreement as written, the Party raising such concern shall provide notice of such law, regulation, policy or provision to the other Party, and Network and Group agree to negotiate in good faith within thirty (30) days to modify the terms of this Agreement to comply with the applicable law, regulation or policy.  If the Parties cannot agree upon the necessary modification, either Party may terminate this Agreement on thirty (30) days' advance written notice.  Further, if at any time before the expiration of this Agreement, any federal, state or local regulatory body including but not limited to the CMS, the Department of Health and Human Services or the Internal Revenue Service determines that this Agreement is illegal, jeopardizes Network's or any Network facilities' tax statuses, or otherwise materially affects Network's activities or business, Network shall provide notice of such determination to Group and Network and Group agree to negotiate in good faith within thirty (30) days to modify the terms of this Agreement to comply with the applicable law, regulation or policy.  If the Parties cannot agree upon the necessary modification, either Party may terminate this Agreement on thirty (30) days' advance written notice.

7.      Independent Contractor.  It is understood between the Parties that Group and all Podiatrists are independent contractors with respect to Network. Nothing in this Agreement shall be construed as creating an employment or joint venture relationship between Group and Network. As an independent contractor, Group is solely responsible for the payment of any applicable federal, state, occupational, FICA, or unemployment taxes owed to its employees and contractors including without limitation, Podiatrists, and Group shall defend, indemnify and hold Network harmless from any such taxes, withholds or assessments.

    7.1     Referrals. Nothing in this Agreement or in any other written or oral agreement between Network and Group, nor any consideration offered or paid in connection with this Agreement or any Statement of Work, contemplates or requires the admission or referral of any patients or business to Network. This Agreement is not intended to influence Group's or any Group Podiatrist's judgment in choosing the hospital or other health care facility or provider deemed by Group or such Group Podiatrist to be best qualified to deliver goods or services to any particular patient. The rights of Group under this Agreement shall not be dependent in any way on the referral of patients or business to Network by Group or any Group Podiatrist.

8.      Professional Liability Insurance.  Group shall secure and maintain for it and each Podiatrist and Non-Physician Provider providing Services under this Agreement professional liability insurance with minimum limits of $1,000,000.00 per occurrence and $3,000,000.00 annual aggregate for acts or omissions of Group, Podiatrist, and Non-Physician Providers that occur on or after the Effective Date of this Agreement. If such insurance is the "claims-made" type insurance, Group shall maintain continuous coverage or shall secure "tail insurance" for Group and each Podiatrist and Non-Physician Provider in order to provide continuing coverage with the same limits of liability as set forth above for any and all claims that may arise out of Services provided under this Agreement for the duration of the applicable statute of limitations.

9.      Indemnification.  Network and Group shall defend, hold harmless and indemnify each other for any claims, demands, actions or liability, including attorneys' fees and costs, arising solely out of the acts or omissions of the indemnifying Party or its employees or agents with respect to this Agreement or the Services being provided. Nothing in this provision shall limit either Party's right to contribution as permitted by law.

10.     Non-Solicitation.  Network and Group agree that during the term of this Agreement neither Party will directly solicit for hire the employees of the other.  Nothing herein shall prohibit either Party from hiring any individual who has responded to a public advertisement for employment by the other Party or any individual who initiates contact with a Party to become employed by such Party, if the contacted Party did not initiate contact with or otherwise solicit the individual to leave his/her employment with the other Party.

11.     Clinical Records, Reports, and Other Records.

    11.1    Patient and Administrative Records.  Group and Podiatrists shall prepare accurate and timely medical records and other documents as required by Network, Medical Staff policies, procedures, rules and regulations, as applicable, and applicable laws and regulations and shall

maintain the confidentiality of such records and related patient information in compliance with applicable federal or state laws and regulations and Network and Network's Medical Staffs' policies, procedures and rules. All such records pertaining to the provision of Services under this Agreement to Network patients in a Network facility are the property of Network and may not be removed or duplicated in any way without Network's specific consent. Group and its agents or employees shall have access to such records both during and after the term of this Agreement, to the extent permitted by applicable law, for all legitimate purposes, including patient care, defense of claims against Group or Podiatrists and matters of patient billing.

11.2    Confidentiality.

(a)    Group and Podiatrists. Group and Podiatrists shall keep confidential and not use or disclose to others during the term of this Agreement or after its termination or expiration, except as expressly agreed to by Network in writing or as required by law, the terms of this Agreement or any Network confidential information or technology, which shall include, but not be limited to, policies and procedures relating to Network and any of its departments or any Network Facility and Services, other proprietary information, patient lists, payer lists or trade secrets of Network or any information the use or disclosure of which might reasonably be construed to be contrary to the best interests of Network ("**Network Confidential Information**"). Group and Podiatrists agree that upon termination or expiration of this Agreement, or upon any Podiatrist leaving employment with Group, neither Group nor any Podiatrist shall take or retain, without prior written consent from Network, any Network Confidential Information in any form or format. Group and Podiatrists further agree that if any restriction contained in this Section is held by any court to be unenforceable or unreasonable, a lesser restriction shall be enforced in its place and remaining restrictions contained herein shall be enforced independently of each other.

(b)    Network. Network and its employees and agents shall keep confidential and not use or disclose to others during the term of this Agreement or after its termination or expiration, except as expressly agreed to by Group in writing or as required by law, the terms of this Agreement or any Group confidential information or technology, which shall include, but not be limited to policies and procedures relating to Group operation, or other proprietary information, patient lists, payer lists or trade secrets of Group or any information the use or disclosure of which might reasonably be construed to be contrary to the best interests of Group ("**Group Confidential Information**"). Network agrees that upon termination or expiration of this Agreement, or upon any individual leaving employment or a contract arrangement with Network, neither Network nor such individual shall take or retain, without prior written consent from Group, any Group Confidential Information in any form or format. Network further agrees that if any restriction contained in this Section is held by any court to be unenforceable or unreasonable, a lesser restriction shall be enforced in its place and remaining restrictions contained herein shall be enforced independently of each other.

11.3    HIPAA. The Parties confirm their intent to comply with the requirements of the Standards for Privacy of Individually Identifiable Health Information 45 C.F.R. 160.103, 164.501 et. seq., as amended from time to time ("**Privacy Standards**") for protected health information ("**PHI**"). The Parties believe that the use and handling of PHI by Group and

Podiatrists in providing Services under this Agreement is related to the provision of patient care services and otherwise authorized under the Privacy Standards without additional agreements, consents or authorizations.

    11.4   Audits. Group agrees until the expiration of four (4) years after the termination or expiration of this Agreement, to retain all of its books, documents and records, which are necessary to certify the nature and extent of all costs and sums paid by Network to Group under this Agreement. Such books, records and documents shall be made available to the Secretary of Health and Human Services, the Comptroller General, or their duly authorized representatives on request. If the Group, subject to Network's consent, carries out any of the duties of this Agreement through a subcontract with a value of $10,000 or more over a twelve-month period with a related individual or organization, the Group agrees to include this requirement in any such subcontract. This Section is included pursuant to and is governed by the requirements of 42 U.S.C.A. Sec. 1395x (v) (1) and the related regulations. No attorney-client, accountant-client, or other legal privilege will be deemed to have been waived by Network, Group or Podiatrists by virtue of this Agreement.

12.    Other Provisions.

    12.1   Complete Agreement; Governing Law, Dispute Resolution. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and may be amended only in writing executed by both Parties. This Agreement supersedes any and all earlier oral or written understandings or agreements between the Parties. This Agreement shall be interpreted, construed and enforced pursuant to and in accordance with the laws of Arizona. Except as specifically provided to the contrary below, all disputes arising out of the interpretation or enforceability of this Agreement shall be resolved by binding arbitration before a single arbitrator mutually selected by the Parties, with such arbitration conducted in accordance with the commercial rules of the American Arbitration Association. In the event the Parties are unable to mutually agree on the selection of an arbitrator within fifteen (15) calendar days of either Party's demand for arbitration, the arbitrator shall be selected by the presiding civil judge of the Superior Court of Maricopa County, Arizona. Notwithstanding the foregoing, in the event of a dispute involving the confidentiality of information, the aggrieved Party may commence a lawsuit and seek injunctive relief. The prevailing Party in any arbitration or lawsuit shall be entitled to reasonable costs, including attorney fees.

    12.2   Non-assignment. Neither Party may assign this Agreement to any third party or entity without the prior written approval of the other Party in its sole discretion, provided however that the assignment of this Agreement to an entity wholly owned by Network shall not require Group's consent.

    12.3   Severability. The invalidity or unenforceability of any Section of this Agreement shall not affect the enforceability of any other Section, and this Agreement shall be construed in all respects as if such invalid or unenforceable Section were omitted, unless such an interpretation would be contrary to the intent of the Parties.

12.4   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which together shall be one document binding on all the Parties even though each of the Parties may have signed different counterparts.   This Agreement also shall be considered executed by the Parties upon receipt by Network by facsimile transmission of the counterparts signed by all the Parties.

12.5   Notice.  Any notices, request, demands and any other communications required or permitted under this Agreement shall be in writing and may be mailed by registered or certified first class United States mail, or delivered to the Parties in person at the following addresses:

<table>
<tr><td>To Network:</td><td>Director of Contracting<br>HonorHealth<br>8125 N. Hayden Road<br>Scottsdale, AZ  85258</td></tr>
<tr><td>To Group:</td><td>Oasis Foot and Ankle Group, LLC<br>6036 N. 19th Avenue #204<br>Phoenix, AZ  85015</td></tr>
</table>

IN WITNESS WHEREOF, the Parties have executed this Agreement as set forth below.

**HONORHEALTH**

Its: Chief Physician Executive/SVP

John Neil, M.D.
Printed Name

Date:   8/10/2016

**GROUP**

Its:

Michael R. Brewer, DPM
Printed Name

46 4797 5 35
Federal Tax ID #

Date:   8/8/16

**Attachment 1**
**Statement of Work**

1.   Services.

1.1.   Practice of Podiatry.  It is acknowledged by the Parties hereto that Podiatry is the practice of medicine.  Group is dedicated to the delivery of quality healthcare that at a minimum meets current standards of care, promotes patient safety, and optimizes patient outcomes.  No provision of this Statement of Work shall be construed to interfere with or to alter the delivery of medical care practiced according to this principle or to increase the applicable standard of care in connection with a professional liability claim against Network, the Group or its Podiatrists.  No Podiatrist shall be coerced by the terms of this Agreement to perform any procedure that is not in that Podiatrist's medical judgment in the best interest of the patient. Group actively promotes this commitment to excellence within its organization and Network and shall have no expectation that any service should be delivered that violates this principle.

1.2.   Services Provided.   Group shall provide the following Services to Network patients:]

1.2.1  On-Call Coverage. Group shall provide on-call coverage services for patients at the Emergency Department. If not at the Hospital when scheduled, Group's Podiatrists must be able to be present at the Hospital within thirty (30) minutes of being called. Subject to the Hospital's capacity and the on-call Podiatrist's scope of practice, Group's Podiatrists shall accept transfer of patients from other facilities, if requested by the Emergency Department and agreed to by the patient, in order to provide the necessary Call Services.

1.2.2   Consultations. Group's Podiatrists shall serve as consulting physicians for patients who are admitted as in-patients to the Hospital and require follow-up treatment who do not have a consulting podiatric physician. Group's Podiatrists shall provide such services consistent with the schedule established by the Hospital.

2.   Location. Group shall provide the Services set forth in this Statement of Work to Network patients at the following locations: John C. Lincoln Medical Center and Deer Valley Medical Center.

3.   Payment and Billing Schedule.

3.1.   Payment for Services. Group will be responsible for billing and collecting from patients or any third party payers for Services provided by Group. Network will have no obligation to pay Group for any Services relating patients, except as set forth below relating to Uninsured Patients. Except as set forth below, Network will not bill patients, responsible third parties or other entities, or any other third party payer for Services, and Group will be entitled to retain all amounts collected by Group.  Network shall pay

12

Group ninety five percent (95%) of the then current Medicare fee schedule for Services rendered to Uninsured Patients.

3.2     Uninsured Patients. If a patient is identified by Hospital as an Uninsured Patient, meaning the patient is without third party coverage through a third party payer, Group may submit a claim for Podiatrist's Services to Network for payment. Should the patient become AHCCCS eligible or health insurance coverage is presented at a later date; the claim will be returned to the provider along with information needed to bill. If the claim has already been processed and the Podiatrist has been paid, Network will request a refund and provide the necessary information for the Podiatrist to bill on the patient's behalf. If the refund is not received in a timely manner, Network shall reserve the right to recoup the money from a future claim.

3.3     Timing of Billing and Payment. Group shall submit any claim under this section on a Form CMS-1500 no later than thirty (30) calendar days after the patient's discharge. The claim shall include all necessary information to be considered clean and shall comply with Medicare's Correct Coding Initiative, as well as other applicable billing requirements and the current HonorHealth Physician Billing Provider Manual. Only Services provided by Group's Podiatrists. Claims are subject to review by Network for inappropriate billing practices (e.g., unbundling, upcoding, etc.) and appropriateness of treatment. Network reserves the right to reject claims and seek additional information if needed to substantiate the claim or to deny claims that do not meet the requirements of this Agreement.

HONORHEALTH

Its: Chief Physician Executive/SVP

John Neil, M.D.
Printed Name

Date: _8/10/2016_

GROUP

_OASIS Feet & Ankle, LLC_
Its:

Michael R. Brewer, DPM
Printed Name

_464797535_
Federal Tax ID #

Date: _8/17/2016_ .

13

# EXHIBIT 2



**American College of
Foot and Ankle Surgeons®**

*Proven leaders. Lifelong learners. Changing lives*

**Position
Statement**

8725 West Higgins Road
Suite 555
Chicago, IL 60631-2724

info@acfas.org
773-693-9300 phone
773-693-9304 fax
acfas.org
FootHealthFacts.org

# Credentialing of Podiatric Foot and Ankle Surgeons and Guidelines for Surgical Delineation of Privileges

*Approved by the ACFAS Board of Directors, July 16, 2011*

### Background

The American College of Foot and Ankle Surgeons (ACFAS) is a medical specialty society of more than 6,300 foot and ankle surgeons. Founded in 1942, ACFAS seeks to promote the art and science of foot, ankle, and related lower extremity surgery; address the concerns of foot and ankle surgeons; and advance and improve standards of education and surgical skill.

Foot and ankle surgery is a subspecialty of podiatric medicine (Doctors of Podiatric Medicine or DPM). Podiatric foot and ankle surgeons conduct medical history and physical examinations, diagnose, and perform medical and surgical management of all diseases, deformities, injuries and defects of the foot, ankle and related lower extremities, as governed by appropriate state statute(s).

The Council on Podiatric Medical Education (CPME) sets rigorous criteria for residencies in podiatric medicine and surgery. ACFAS members have had extensive training in foot, ankle and related lower extremity surgery and are examined and board certified (or board qualified) in foot and ankle surgery by the American Board of Podiatric Surgery (ABPS). Additionally, medical staff privileges in acute and ambulatory settings are held by most ACFAS podiatric surgeons.

The ACFAS position is that the credentialing processes for granting privileges for the specialty of foot and ankle surgery should be uniformly applied to all surgeons seeking foot and ankle surgery privileges, regardless of medical degree. These privileges should be based on the completion of a residency that is duly accredited by the surgeons' official medical and surgical associations, with a focus on foot and ankle surgical training. In addition, the privileging process should evaluate specialized foot and ankle fellowship documentation, surgical residency training logs, and/or demonstration of current clinical experience at other facilities, continuing education, and accreditation, along with board certification or qualification.

Allopathic (MD) and osteopathic (DO) physicians are not certified in specialty foot and ankle surgery, nor do they presently function under the quality assurance tool of a certificate of added qualifications for the same within their respective specialties. Any credentialing comparisons between MD and DO colleagues and podiatric foot and ankle surgeons should be based on specialty-specific foot and ankle training, not generalized years of training.

### Application

Podiatric foot and ankle surgeons should complete the same application process as all other surgeons seeking staff appointments. Equal processing standards consistent with the acute and ambulatory settings' bylaws, rules and regulations that govern all surgical specialties should be fairly applied to all surgeons seeking appointment.

**American College of
Foot and Ankle Surgeons**
*Proven leaders. Lifelong learners. Changing lives.*

**Position
Statement**

8725 West Higgins Road
Suite 555
Chicago, IL 60631-2724

info@acfas.org
773-693-9300 phone
773-693-9304 fax
acfas.org
FootHealthFacts.org

### *Privileging*

Foot and ankle surgery is a subspecialty practiced mainly by podiatric foot and ankle surgeons and orthopedists that may have specialized training and/or fellowship training in foot and ankle surgery. The granting of clinical privileges for a foot and ankle surgeon with a DPM degree should be based on fair and objective analysis that follows the same requirements as set forth in evaluating other physician and dental specialists consistent with The Joint Commission (TJC) standards and/or Medicare Conditions of Participation (CoP).

TJC standards specify that evidence of current license, competence, relevant training and ability to perform the procedures that the privileges request should form the basis of privilege delineation. The available clinical privileges in an acute or ambulatory setting should represent the scope of practice as defined by state law.

### *Credentialing for Podiatric Foot and Ankle Surgeons*

Foot and ankle surgical training, demonstration of current clinical experience in foot, ankle and related lower extremity surgery, and continuing medical/surgical education are also important credentialing elements recognized by TJC. These key elements allow for measurable and uniform objective criteria to be applied in evaluating a DPM for privileges in foot and ankle surgery. In addition, consideration of scholarly and academic achievements may be factored into the decision-making process.

Individual credentialing and surgical privilege delineation is determined by an individual's qualifications and documentation consistent with other specialties and TJC standards or CoPs.

### *Delineations*

Specific procedural delineation is based on individual training and documented experience. Two core categories of surgical delineation are defined by ACFAS:

- Foot and ankle
- Complex rearfoot, ankle, and related lower extremity structures

A "special procedures" category is also defined for specialized and evolving technologies and procedures.

### *Criteria*

- ABPS Certification or Qualification in Podiatric Surgery.
- Demonstration of training and achieved competency in specific procedures for which the DPM is requesting privileges, such as:
  - Current clinical experience
  - Documented surgical logs or operative reports
  - Post-graduate continuing medical education
  - Fellowship documentation (if applicable)
  - Letters of documentation from training directors
  - Verification and documentation from collateral sources



**American College of
Foot and Ankle Surgeons**
*Proven leaders. Lifelong learners. Changing lives.*

**Guidelines**

8725 West Higgins Road
Suite 555
Chicago, IL 60631-2724

info@acfas.org
773-693-9300 phone
773-693-9304 fax
acfas.org
FootHealthFacts.org

# American College of Foot and Ankle Surgeons Guidelines for Surgical Delineation of Privileges

*Approved by the ACFAS Board of Directors, July 16, 2011*

Applicant's Name: _____   Date: _____

Type:  (  ) New Applicant     (  ) Supplemental Upgrade

## Core Level 1 Privileges: Foot and Ankle

Privileges to admit as qualified, evaluate, diagnose, provide consultation, order diagnostic studies and perform surgical and non-surgical procedures of the foot and ankle and lower leg using any necessary method within the standard of care.

1. Soft tissue procedures of the foot and ankle and lower leg including: incision and drainage; lesion and mass excision; ligament and tendon repair; adjunctive tendon lengthening of the related lower leg; skin grafts, tarsal tunnel decompression.
2. Osseous procedures including osteotomies of the foot; ostectomies of the foot and ankle; open and closed reduction of the forefoot and lesser tarsal fractures/dislocations; osseous fusions of the foot (excluding triple arthrodesis).
3. Amputations of portions of the foot.
4. Extracorporeal shock wave therapy.
5. CO2 laser use.

## Core Level 2 Privileges: Complex Rearfoot, Ankle, and Related Lower Extremity Structures *

Privileges to include performance of complex rearfoot, ankle, and related lower extremity structures using any method within the standard of care.

1. Osteotomy of the ankle and related lower leg; arthrodesis of the ankle (open and arthroscopic).
2. Tendon reconstruction and transfers of the ankle and related lower leg.
3. Fracture management: closed and open repair of major foot and ankle fractures (os calcis and talus), ankle, and related lower leg structures; and osteoarticular cartilage grafts.
4. Osseous fusions of the hindfoot and ankle.
5. Arthroscopy of the foot and ankle.

*Isolated procedures from Core 2 may be granted with proper documentation as defined within this document.



**American College of Foot and Ankle Surgeons** *
Proven leaders. Lifelong learners. Changing lives.

**Guidelines**

8725 West Higgins Road
Suite 555
Chicago, IL 60631-2724

info@acfas.org
773-693-9300 phone
773-693-9304 fax
acfas.org
FootHealthFacts.org

*Special Procedures* *

1. Total ankle replacement
2. Management of pilon fractures
3. Other:

_____
_____
_____

*Credentialing for "Special Procedures" requires additional documentation of training, qualification and post graduate training courses specific to the procedures or technologies.

_____
Chair, Department or Section

_____
Chair, Credentials Committee

_____
Date of Review

Comments: _____

_____
_____
_____

# EXHIBIT 3



**American College of
Foot and Ankle Surgeons®**
*Proven leaders. Lifelong learners. Changing lives.*

*Position
Statement*

8725 West Higgins Road
Suite 555
Chicago, IL 60631-2724

info@acfas.org
773-693-9300 phone
773-693-9304 fax
acfas.org
FootHealthFacts.org

## Education, Training and Certification of Foot and Ankle Surgeons (DPMs)
*Approved by the ACFAS Board of Directors, November 11, 2011*

Foot and Ankle Surgeons (DPMs) who are Certified in Foot and Ankle Surgery or Certified in Foot Surgery and Certified in Reconstructive Rearfoot/Ankle Surgery by the American Board of Podiatric Surgeons (ABPS) are physicians specifically trained to diagnose and treat the foot and ankle. They are an integral part of the health care team, and combined with all other podiatric physicians, treat the majority of foot related medical issues in the U.S. Orthopaedists are the second largest providers of foot related medical issues.[1]

### Each ABPS Board Certified Foot and Ankle Surgeon has:

- **Completed four years of Podiatric Medical School**. Identical in length to Allopathic and Osteopathic Medical Schools, the Podiatric Medical School curriculum covers basic and clinical sciences, including, but not limited to: general anatomy; pathology; biochemistry; pharmacology; general medicine; surgery; pediatrics; behavioral sciences; and ethics. Unlike Allopathic and Osteopathic Medical Schools, the Podiatric Medical School curriculum also provides intensive foot and ankle specialty specific education beginning in the first year.

- **Completed post-graduate Podiatric Medicine and Surgery (PMSR) Residency (formerly known as PSR, PM&S-24 or PM&S-36)**. Similar to, and often integrated with residencies for MDs and DOs, Podiatric Surgical Residency programs provide training in general medicine, general surgery and surgical specialties. The critical difference, though, is in the volume of cases and time spent in foot and ankle specific training. Podiatric Surgical Residency Programs, which are a minimum of three years, provide significantly more foot and ankle training than any other specialty.[2] A foot and ankle surgeon (DPM) will have demonstrated a cognitive knowledge of podiatric surgery, including the diagnosis and treatment of general medical problems and surgical management of foot and ankle diseases, deformities, and/or trauma, and those structures that affect the foot, ankle, and leg.[3] Multiple general orthopaedic resident surveys have shown that graduating general orthopaedic surgeons feel their program was deficient in foot and ankle surgery and that they are least prepared to treat the foot and ankle upon entering into private practice.[4]

### The Board Certification Difference

ABPS certifies foot and ankle surgeons who have successfully completed an intense certification process comparable to that of individual MD and DO specialties. Candidates must complete Part I and Part II of the certification examination(s), in addition to submitting surgical case logs. ABPS requires four years of post-DPM degree clinical experience and completion of an appropriate Council on Podiatric Medical Education (CPME)-approved residency program before taking the certification examination(s). Additionally, Diplomats must re-certify every 10 years to maintain their board certified status, with new requirements for maintenance of certification (MOC) on the horizon. All Fellows of the American College of Foot and Ankle Surgeons (ACFAS) are certified by ABPS.

**American College of
Foot and Ankle Surgeons®**
Proven leaders. Lifelong learners. Changing lives.

*Position
Statement*

8725 West Higgins Road
Suite 555
Chicago, IL 60631-2724

info@acfas.org
773-693-9300 phone
773-693-9304 fax
acfas.org
FootHealthFacts.org

Prerequisites for board qualification in foot surgery require successful completion of a CPME-approved PMSR (formerly PM&S-24 residency program) and passage of Part I of the Certification in Foot Surgery Examination. Board qualification in reconstructive rearfoot/ankle surgery requires successful completion of a CPME-approved PMSR (PSR-24 or PM&S-36 residency program) and passage of Part I of the Certification in Reconstructive Rearfoot/Ankle Surgery Examination. Board Qualified in Foot Surgery is a prerequisite for Board Qualified in Reconstructive Rearfoot/Ankle Surgery.

A candidate must past Part II of the Certification in Foot Surgery Examination for board certification in foot surgery and Part II of the Certification in Reconstructive Rearfoot/Ankle Surgery Examination for board certification in reconstructive rearfoot/ankle surgery. ABPS certification in foot surgery is a prerequisite for board certification in reconstructive rearfoot/ankle surgery.

In addition, ABPS requires submission of 65 surgical procedures with full case documentation for certification in foot surgery and an additional 30 rearfoot/ankle procedures for full case documentation for certification in reconstructive rearfoot/ankle surgery, for a total of 95 cases.

The critical differences between Board Certified Foot and Ankle Surgeons (DPMs) and Board Certified Orthopaedists (MD/DOs) are:

- The ABPS certification process involves examination specific to the foot and ankle. One hundred percent of the board certification examination in Podiatric Surgery is relevant to the foot, ankle and lower leg. Less than five percent of the American Board of Orthopaedic Surgery (ABOS) certification examination is specific to the foot and ankle.

- The ABPS certification process involves proving experience specifically in the performance of foot and ankle surgical procedures, whereas the ABOS do not.

- The ABPS certification process certifies podiatric physicians specifically in Foot and Ankle Surgery. There is no Foot and Ankle specific certification process for orthopaedic surgeons.

**The Practice Difference**

- Both Foot and Ankle Surgeons (DPMs) Board Certified in Foot and Ankle Surgery, or Board Certified in Foot Surgery and Board Certified in Reconstructive Rearfoot/Ankle Surgery and Orthopaedic Surgeons (MD/DOs) are credentialed and privileged by hospitals, surgery centers, medical centers and educational institutions in a standardized process, specified by recognized accrediting organizations.[5] This standardized process mandates requirements that both groups must meet or exceed; and provides for an equitable peer review process. This process, however, may not require board-certified orthopaedists to demonstrate any special skills or training in foot and ankle surgery, whereas Foot and Ankle Surgeons (DPMs) must demonstrate training and experience specific to the foot and ankle to obtain privileges. New accreditation standards and Medicare Conditions of Participations (CoPs) are eliminating these discrepancies and asking all applicants to demonstrate initial and ongoing competence in the specific privileges they are seeking.[6]

**American College of
Foot and Ankle Surgeons**

*Proven leaders. Lifelong learners. Changing lives.*

*Position
Statement*

8725 West Higgins Road
Suite 555
Chicago, IL 60631-2724

info@acfas.org
773-693-9300 phone
773-693-9304 fax
acfas.org
FootHealthFacts.org

- Podiatric Surgeons Board Certified in Foot and Ankle Surgery or Board Certified in Foot Surgery and Board Certified in Reconstructive Rearfoot/Ankle Surgery exclusively limit their practice to the care of the foot and ankle, whereas the majority of general orthopaedists treat a multitude of musculoskeletal complaints throughout the entire body.

- Podiatric Surgeons Board Certified in Foot and Ankle Surgery or Board Certified in Foot Surgery and Board Certified in Reconstructive Rearfoot/Ankle Surgery and orthopaedists are both required to attend Continuing Medical Education courses on a yearly basis to maintain state licensure. Only Podiatric Foot and Ankle Surgeons are required to attend foot and ankle specific courses, whereas orthopaedists may complete their Continuing Medical Education requirement entirely in areas outside the foot and ankle.

Questions about **Foot and Ankle Surgeons** can be directed to Kristin Hellquist, Director of Health Policy, Practice Advocacy and Research at 773-444-1322 or kristin.hellquist@acfas.org.

---

[1] Centers for Medicare and Medicaid Services (CMS)

[2] Council for Podiatric Medical Education (CPME).

[3] ABPS 110.

[4] Dailey, et al., August 1998, American Journal of Orthopedics 563-570.

[5] Recognized accrediting organizations include the Joint Commission, the Accreditation Association for Ambulatory Health Care the American Osteopathic Association; the American Association for Accreditation of Ambulatory Surgery Facilities, Inc.; National Committee for Quality Assurance; the organization formerly known as URAC; and others

[6] The Joint Commission standards for hospital/ambulatory accreditation MS 1.1.